UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 11-CR-10133-RWZ

UNITED STATES

v.

ANTHONY HAMILTON

<u>MEMORANDUM OF DECISION</u>

September 4, 2013

ZOBEL, D.J.

Defendant Anthony Hamilton is accused of robbing a Citizens Bank in Malden, Massachusetts, and has been charged in an indictment with armed bank robbery, 18 U.S.C. § 2113(a)(d) (Count I), being a felon in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(1) (Counts II and IV), and using, carrying, and discharging a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c)(1)(A) (Count III). He now moves to suppress all evidence seized from 16 Harrow Street, Apartment # 2 in Dorchester, Massachusetts during a warrantless search by law enforcement officials (Docket # 54), as well as to suppress a photo identification made by a teller from the bank (Docket # 57). The court held an evidentiary hearing on March 6 and April 3, 2013, permitted the parties to submit additional briefing, and heard oral argument on August 14, 2013.

## I. Background

Except where otherwise noted, the following facts are largely undisputed:

### A.  The Robbery

On December 16, 2010, a man robbed a Citizens Bank in Malden, Massachusetts.  He approached teller Victoria Lawyer ("Lawyer"), handed her a note asking for money, made a verbal demand, and received $4,700.  The man then attempted to leave, but a bank employee activated a "man-trap" which locked him into a glass vestibule between the inside of the bank and the outside of the building.[1]  Upon realizing that he was trapped, the robber began swearing and shouting to be let out. He then pulled out a handgun, fired several rounds into the exit door, broke out and fled the scene in an unknown direction.  Surveillance cameras in the vestibule captured images of a young black male in a dark jacket and a light-colored Red Sox baseball cap.

### B.  The Investigation

Members of the FBI Bank Robbery Task Force ("Task Force")[2] investigated the robbery.  Robert DiSalvatore ("DiSalvatore"), a detective with the Malden Police Department assigned to the Task Force, interviewed Lawyer and another bank teller, Barbara Orsini ("Orsini"), who had witnessed the robbery.  Orsini provided a description

---

[1] The bank's entrance has a two-door arrangement: to exit the bank, one must walk through a door into a vestibule and then through another door to the outside.  The bank is equipped with a "man-trap" system that allows tellers to lock either door from their stations, thereby trapping someone within the vestibule.

[2] The Bank Robbery Task Force is now known as the Violent Crimes Task Force.

of the robber as a "black male, clean shaven, approximately five feet seven inches tall, slim build" with "dark skin" wearing a "dark plain wool jacket, light gray baseball hat, [and] jeans."  4/3/13 Tr. at 19.

The Task Force members believed the robbery may be connected to several other similar bank robberies that had occurred throughout the area in December 2010 and January 2011.  Information about these robberies, including the one in Malden, was posted on a website called "Mass Most Wanted."  On January 5, 2011, the Westford Police Department received an anonymous tip via the website that the individual depicted in connection with another robbery in Westford, Massachusetts, looked like someone named Anthony Hamilton.

This information was conveyed a few days later to Massachusetts State Police Trooper Shawn O'Neil ("O'Neil"), a member of the Task Force and lead investigator on the bank robberies.  O'Neil queried the Registry of Motor Vehicles with the name "Anthony Hamilton" and obtained a driver's license record and photograph of defendant.  He also pulled a booking photograph of defendant from the Boston Police Department.  In comparing the photographs of defendant with the surveillance images of the Malden robber, O'Neil opined that it was the same person.

O'Neil also ran a criminal record check on defendant and learned that he was on probation.  On January 25, 2012, O'Neil contacted defendant's state probation officer and sent her a number of surveillance photographs from the series of recent robberies. The probation officer identified the individual depicted in the Malden robbery photograph as defendant.  She also indicated that she had met with defendant at his

grandmother's house at 66 Tibbetts Town Way in Charlestown, Massachusetts, and gave him additional information, including defendant's cell phone number, his workplace, and his employer's phone number.

O'Neil prepared a photo array to be shown to the Malden bank tellers, Lawyer and Orsini.  It consisted of a series of eight photographs, including defendant's booking photo, to be shown sequentially.  On January 22, 2011, a Malden Police officer who did not know which photo depicted the suspect, presented the array to Lawyer, who was unable to identify defendant or anyone else as the robber.  On January 25, 2011, Detective DiSalvatore, who knew defendant was the suspect, showed the array to Orsini.  Orsini set aside two photographs "that kind of looked alike," 4/3/13 Tr. at 60, and, after reviewing the two for several minutes, selected defendant's photograph.

### C.  Entry into 16 Harrow Street and Arrest of Defendant

The investigation yielded multiple potential addresses for defendant.  Chief among these was 66 Tibbetts Town Way in Charlestown, which appeared on his criminal record, driver's record, and outstanding state court probation warrants.  A public database search also indicated that at some point, a person by the name of Anthony Hamilton, with no date of birth or other identifiers, had given 16 Harrow Street in Dorchester, Massachusetts, as his address.  Defendant had never been seen at or near 16 Harrow Street, nor was he captured on continuous pole camera footage taken outside of the house.  However, a vehicle that officers believed was connected to the robberies was observed near 16 Harrow Street at least twice, and once an unidentified

man got out of the car and approached the address.[3]

O'Neil ran postal and utility searches of 16 Harrow Street to determine who was living there and then checked the names for criminal records. While defendant's name did not turn up, he found that an individual named Tommy Smith received mail at that address and had an outstanding state arrest warrant for motor vehicle violations listing 16 Harrow Street, Apartment # 2 as his address. O'Neil also ran a search on the license plate number of a car he'd seen outside the residence and learned it was registered to the Smith family. He did not believe that any of the occupants were involved in the bank robberies.

O'Neil obtained an arrest warrant for defendant on February 14, 2011. He contacted the Massachusetts State Police Violent Fugitive Apprehension Squad ("MSP VFAS") and the Boston Police Department Special Operations Squad ("BPD SOS") and notified them that Tommy Smith had an active warrant and lived at 16 Harrow Street. O'Neil also informed them that the FBI was searching for defendant and that he, too, might be in the apartment. Officer Stephen Ridge of the Boston Police Department checked various sources, including booking reports, incident reports, a National Insurance Crime Bureau accident report, and credit bureau reports, to confirm that Tommy Smith lived at that address.

MSP VFAS and BPD SOS agreed to coordinate their efforts with the FBI Task Force to execute the arrest warrants, and officers from the three groups met together

---

[3] O'Neil also testified that on January 20, 2011, the same vehicle got into a traffic accident and defendant was identified as one of the passengers.

on either the evening of February 15 or the early morning of February 16.  At the

meeting, O'Neil indicated that the state and city officers were going into 16 Harrow

Street to look for Tommy Smith, but that his "best guess" was that defendant would also

be at that address.  3/6/13 Tr. at 89.  He informed the assembled officers that

defendant was charged with armed bank robbery and showed them defendant's

photograph.  O'Neil also arranged for small Task Force surveillance teams to monitor

five other addresses associated with defendant, including 66 Tibbetts Town Way in

Charlestown.

At around 6 a.m. on February 16, O'Neil and three other Task Force members

set up outside of 16 Harrow Street while approximately 15 to 20 officers from MSP

VFAS and BPD SOS entered the residence.  The officers entered the building through

an exterior side door, went up one flight of stairs, and knocked loudly on the door to

Apartment # 2.[4]  Upon hearing the officers identify themselves as police, Amina Smith

("Amina"), a resident of the apartment and defendant's longtime girlfriend, opened the

door slightly to find out what they wanted.  The officers stated that they were looking for

Tommy Smith.  Amina indicated that Tommy Smith did not live there, but the police

pushed past her into the apartment.  Amina's mother Carolyn Smith ("Smith"), the renter

of the apartment, came down from the top floor stating that Tommy Smith did not live

there and asking why they were looking for him, but at that point, the officers had

already begun moving throughout the home.  They did not find Tommy Smith, but

observed defendant there wearing a T-shirt and underwear and radioed the Task Force

---

[4] Apartment # 2 of 16 Harrow Street comprises the top two floors of a three-story building.

members waiting outside.  O'Neil entered the apartment, identified defendant, arrested

him and advised him of his <u>Miranda</u> rights.  Defendant asked for his clothes and jacket,

which the officers located in Amina Smith's bedroom.  Defendant's birth certificate was

found in his jacket pocket.

At the time of the police raid, there were ten occupants staying in the apartment,

including Smith, her boyfriend Willie James Tutt ("Tutt"), her daughter Amina, and

Amina's three-month-old baby with defendant.  Tommy Smith, Carolyn Smith's son, was

not in the apartment and had not been living there for over one year, though he

stopped by approximately once a week to pick up mail and drop off his child.  O'Neil

showed Amina surveillance photographs from the Westford and Malden robberies, and

she indicated that defendant was not depicted in either.  O'Neil then showed the same

photographs to Smith and Tutt.  They did not identify anyone in the Westford robbery

picture, but indicated that the individual in the Malden robbery picture looked like

defendant.[5]  Smith and Tutt also stated that they had known defendant for a few years

and that he stayed over periodically as a guest.

### D.  Search of 16 Harrow Street

Defendant was removed from the building and transported to the Boston Police

Department, where he was booked.  In the meantime, Massachusetts State Police

Trooper Steven Wohlgemuth ("Wohlgemuth"), a member of the Task Force, spoke with

---

[5] O'Neil and Smith offered conflicting testimony regarding the specific nature of this alleged "identification," which is the subject of another motion to suppress by defendant (Docket # 55).

Smith and Tutt in the kitchen and sought their consent to search the apartment.[6]

Approximately two or three additional Task Force members were present in the kitchen

area during the conversation, while other officers were elsewhere in the apartment.

Smith and Tutt both signed consent forms permitting the Task Force to conduct a

search, but, as explored in detail below, the circumstances of that consent are in

dispute.  After the forms were signed, the Task Force searched the apartment and

found a Ruger 9 millimeter pistol with two magazines and bullets and a gun carrying

case under a mattress in Amina Smith's bedroom.

## II. Discussion

### A.  Motion to Suppress Evidence Seized at 16 Harrow Street

Defendant claims that the seizure of items at 16 Harrow Street violated his

Fourth Amendment rights.  He challenges both the police entry into the apartment and

the voluntariness of Smith's consent to the police search.

### 1.  Standing

In order to invoke the protection of the Fourth Amendment, defendant must first

establish that he "personally has a reasonable expectation of privacy in the place

searched."  United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012) (citing Rakas

v. Illinois, 439 U.S. 128, 143 (1978)).  The government asserts that defendant lacks

standing to challenge the entry, search, and seizure at 16 Harrow Street because "he

---

[6] Wohlgemuth testified that Smith and Tutt indicated to him that they were co-renters of the apartment.  At the hearing, Smith clarified that she was the sole renter of Apartment # 2, and that Tutt, though technically residing in the downstairs apartment, actually lived upstairs with her, albeit in violation of Section 8 housing regulations.

has not alleged sufficient facts to suggest that he had a specific expectation of privacy

for the space underneath Amina Smith's bed" and he "had been removed from the

home at the time the search was performed."  Such arguments are unavailing.

Defendant was a welcome overnight guest in the apartment, and specifically in Amina

Smith's room, and therefore harbored a legitimate expectation of privacy in those

premises pursuant to Minnesota v. Olson, 495 U.S. 91, 98 (1990).  The fact that he was

taken out of the apartment just prior to the police search does not diminish that

expectation.  Defendant has clearly demonstrated Fourth Amendment standing.

### 2.  The Entry

Defendant contends that law enforcement officers lacked the legal authority to

enter 16 Harrow Street to execute the arrest warrants for himself or Tommy Smith.  A

valid arrest warrant "implicitly carries with it the limited authority to enter a dwelling in

which the suspect lives when there is reason to believe the suspect is within."  Payton

v. New York, 445 U.S. 573, 603 (1980).  Conversely, in order to execute an arrest

warrant at the home of a third party, officers must, absent exigent circumstances, obtain

a search warrant or the consent of the residents.  Steagald v. United States, 451 U.S.

204, 205-206 (1981).  See also Joyce v. Town of Tewksbury, 112 F.3d 19, 21-22 (1st

Cir. 1997) (en banc) ("[E]ven when armed with an arrest warrant, police must generally

have a search warrant to enter lawfully a third person's home.").  It is undisputed that

neither defendant nor Tommy Smith actually lived at 16 Harrow Street, Apartment # 2

on February 16, 2011, and there were no exigent circumstances, search warrant, or

consent to justify the entry.  Thus, law enforcement officers must have had a

reasonable, albeit mistaken, belief that defendant or Tommy Smith resided at 16

Harrow Street and would be present at the time of the entry.  United States v. Werra,

638 F.3d 326, 336-37 (1st Cir. 2011); Solis-Alarcon v. United States, 662 F.3d 577, 580

(1st Cir. 2011).  A reasonable belief requires more than mere "suspicion," but less than

"probable cause"; the question turns on whether, given the information available, a

reasonably prudent officer could believe that either man lived at the apartment and was

within on the morning of the raid.  Id. at 181.

The police did not possess a reasonable belief that defendant resided at 16

Harrow Street or that he would be there at the time of entry.  The only link between

defendant and 16 Harrow Street was a single reference in a public database that

someone named Anthony Hamilton had used the address at some point.  All official

documents, including defendant's criminal record, driver's record, and two outstanding

probation warrants, listed his address as 66 Tibbetts Town Way in Charlestown.

Defendant's state probation officer told Trooper O'Neil, the lead Task Force

investigator, that she last met with defendant at 66 Tibbetts Town Way and that his

grandmother lived there.  In contrast, defendant had never been observed by

investigators at or near 16 Harrow Street, and his name did not appear in utility and

postal searches for that address.  Pole camera surveillance footage once showed a

man getting out a car possibly associated with the bank robberies and entering the

residence, but investigators were unable to identify the man.  O'Neil testified that he did

not know where defendant was the morning of February 16, 2011, and that 16 Harrow

Street was only his "best guess" as to his location.  3/6/13 Tr. at 89.  O'Neil also

conceded that he knew defendant's connections to 16 Harrow Street were too tenuous on their own to sustain entry and that he therefore sought another reason to enter the home.

That other reason was Tommy Smith.  While officers could not rely on defendant's arrest warrant to justify the entry into 16 Harrow Street, the same is not true with respect to Tommy Smith.  The police had multiple reasons to believe that Tommy Smith lived in the apartment.  They had an active arrest warrant, issued on January 11, 2011, listing 16 Harrow Street as his residence.  A postal search indicated that Tommy Smith received mail there, and a vehicle seen outside the residence was found to be registered to the Smith family.  Various other sources, including a public database, booking reports, incident reports, a National Insurance Crime Bureau accident report, and credit bureau reports, confirmed Tommy Smith's connection with that address.

It is true that officers did not physically observe Tommy Smith entering or leaving 16 Harrow Street during the weeks leading up to the raid.  "The 'reasonable belief' standard does not, however, require direct observation or actual knowledge."  Lucas v. City of Boston, CIVA 07-CV-10979-DPW, 2009 WL 1844288, at *15 (D. Mass. June 19, 2009).  See also, United States v. Graham, 553 F.3d 6, 13 (1st Cir. 2009) ("[T]he police need not possess such rock-solid indicators of residence [as credit card applications, utility bills, car registration, and mail] in order to form a 'reasonable belief' that a suspect resides at a given place.").  The information gathered by police, taken together, supported a reasonable belief that Tommy Smith resided at 16 Harrow

Street.[7]  See e.g., Lucas, 2009 WL 1844288, at * 14 (reasonable belief of residence

where suspect provided address to the registry of motor vehicles and gave address as

place of residence when he was booked for arrests); United States v. Powell, 379 F.3d

520, 523-24 (8th Cir. 2004) (officers could rely on address listed in a "warrant list"

database system in executing arrest).  And, if Tommy Smith did live there, it would be

reasonable to conclude he would be home at 6:00 a.m.  Solis-Alarcon, 662 F.3d at 582

(it was reasonable for police to believe suspect would be "in residence early in the

morning."); Lucas, 2009 WL 1844288, at *14 (finding that "the early morning timing of

the raid – around 6:00 a.m. – provided a sufficient basis for the officers to form a

'reasonable belief' that [the targeted suspect] would be present at the time they entered

the apartment."); United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005) ("the

early morning hour was reason enough" for officers to believe suspect would be at

home when they executed arrest warrant); United States v. Bervaldi, 226 F.3d 1256,

1267 (11th Cir. 2000) (in absence of evidence to the contrary, agents reasonably

concluded that suspect would be home at 6:00 a.m.).

Finally, defendant argues that the officers' entry into 16 Harrow Street was

unlawful because it rested upon pretextual grounds, i.e., the police entered the house

purportedly seeking to arrest Tommy Smith, but in actuality were looking for defendant.

Given the scope and nature of the raid, as well as the testimony of O'Neil and other law

enforcement officers, it certainly appears that the true target that morning was

---

[7] The officers were not obligated to believe Amina Smith's doorstep assertion that Tommy Smith did not live in the apartment.

defendant.  Nonetheless, "[t]he question is not one of pretext, and the subjective intent of the police plays no role in the analysis of a motion to suppress under the Fourth Amendment."  United States v. Weems, 322 F.3d 18, 23-24 (1st Cir. 2003) (citing Whren v. United States, 517 U.S. 806, 813 (1996)).  "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' . . . and not the officer's actual state of mind at the time the challenged action was taken."  Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (quoting Scott v. United States, 436 U.S. 128, 136 (1978)).  Here, regardless of the raid's true purpose, the officers' entry into 16 Harrow Street on the basis of Tommy Smith's arrest warrant was objectively reasonable under the Fourth Amendment.

### 3.  Carolyn Smith's Consent to Search

Shortly after defendant was arrested and removed from 16 Harrow Street, Carolyn Smith signed a consent form granting permission for officers to search her home.[8]  While warrantless searches are presumptively unreasonable under the Fourth Amendment, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citations omitted).  Where, as

---

[8] While Willie Tutt, who was not the renter of the apartment, also signed a consent form, the government does not claim that the officers based their search on Tutt's apparent authority to consent.  Cf. United States v. Meada, 408 F.3d 14, 21 (1st Cir. 2005) (police reasonably believed that defendant's girlfriend had the authority to consent to a search of his apartment).

here, the government "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  "Whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227.  The First Circuit has instructed that courts weighing voluntariness should consider factors such as the age, education, experience, intelligence, and knowledge of the right to withhold consent of the consenting party, as well as evidence of coercive means or inherently coercive circumstances.  United States v. Barnett, 989 F,2d 546, 554-55 (1st Cir. 1993).  Courts must also consider "any evidence that law enforcement officers' fraud, deceit, trickery or misrepresentation prompted [the] acquiescence to the search."  United States v. Vanvliet, 542 F.3d 259, 264-65 (1st Cir. 2008) (citations omitted).

Defendant argues that those factors, applied to Smith, show that her consent to search was not freely and voluntarily given.  The events leading up to the search were hectic: early in the morning on February 16, 2011, Smith and the other occupants of 16 Harrow Street – including her children, grandchildren, and a couple of guests – were suddenly awoken by police at the front door demanding entry. When Amina opened the door, approximately 15 to 20 officers pushed past her and quickly made their way into and through the apartment.  The police claimed to be searching for Tommy Smith, but then found defendant, whom they arrested as a suspect in an armed bank robbery. Smith testified that the scene was "a lot of chaos," with police "all over the place,"

14

4/3/13 Tr. at 86-87, and that the officers threatened her in various ways in order to get her to consent to a search. The officers asked if the apartment was Section 8 housing and noted that they would report her to the housing authorities for having too many people staying there if she failed to "cooperate," which she understood to mean that she needed to allow them to search. Id. at 88. Smith further testified that she is disabled and unable to afford market rent, so she was "really kind of afraid" at the prospect of losing her Section 8 housing. Id. Officers also told her that if she did not consent, "they would have everybody go outside and they would lock the house up," id. at 89, while they obtained a search warrant. This particularly concerned Smith given the early hour and the cold temperatures outside; the occupants of the house were all still in pajamas, and she felt that her infant granddaughter (defendant's child) "was too young to be outside like that in the cold" waiting for a search warrant to issue. Id. Smith also testified that the officers noted that her granddaughter could be taken away and put in the custody of the state Department of Children and Families ("DCF"). Finally, she said that she signed the consent form because she "had nothing to hide" since she believed officers only wanted to search for her son Tommy, who, she knew, was not present in the apartment. Id. Smith's version of the events is supported by an affidavit signed by her daughter Amina, wherein she states that officers told her mother "that they could report her to Section 8" but "would not report her if everyone cooperated"; that officers told Amina that her baby "could be taken," but "would not be taken if [she] cooperated"; and that officers said that if they had to get a warrant, everyone would have to wait outside. Defendant's Ex. O at ¶¶ 6-8.

The government offers a starkly different version of the circumstances surrounding the consent.  Trooper Wohlgemuth testified that his interaction with Smith was friendly and cordial.  He explained to Smith that the FBI wanted her consent to search the apartment for evidence regarding defendant and that she had the right to refuse.  He gave Smith a copy of the consent form and read it aloud to her, and she indicated that she understood and did not express any confusion regarding the form. The form itself indicates that the signer has been advised of her right to refuse consent and that she gives permission to search voluntarily.  At the time of the consent conversation, there were only a couple other Task Force members in the room, though there were still a significant number of law enforcement officers elsewhere in the apartment.  Wohlgemuth conceded telling Smith that everyone would have to wait outside if a search warrant was necessary.  He remembered that Smith herself told him that the apartment was Section 8 housing, but he denied bringing up the number of occupants in the home or threatening to report her for housing violations.  As for Smith's granddaughter, Wohlgemuth recalled telling Amina Smith that he might need to speak with DCF regarding her baby's living conditions, but maintains that this conversation took place after consent to search had been given and after the gun had been found.

In light of these conflicting accounts, the court must necessarily make credibility determinations.  United States v. Medina, 451 F. Supp. 2d 262, 269 ("When, as here, the Court is confronted with two divergent accounts of the critical events at issue, the Court, as the finder of fact, may weigh the credibility of the witnesses.").  As the

16

government points out, Smith's testimony is not without problems.  Notably, when

questioned about her consent before the grand jury in this case on March 30, 2011,

Smith indicated that the officers explained clearly that they wanted to search the house

and did not pressure or "strong-arm" her into granting consent.[9]  Smith attempted to

clarify her testimony at the hearing, claiming that she had thought "strong-arm" meant

that the officers had grabbed her or held on to her.  She insisted that she was not

asked specifically about threats before the grand jury, and that verbal threats were

indeed made, particularly regarding her housing.  I am not persuaded by this

explanation of the inconsistency and do not credit Smith's hearing testimony.

　　　This is a close case, but taking into account the totality of the circumstances, I

conclude that the government has met its burden of proving by a preponderance of the

evidence that Smith's consent to search was voluntarily and freely given.  While the

---

[9] Smith testified as follows before the grand jury:

> Q: Now, after you told that it looks like Anthony, did [the officers] ask you if, permission of anything?
> A: Yeah.  They ask me could they search the house.
> Q: And did you, did they explain that to you?
> A: Yes.
> Q. Was there any difficulty about explaining it?
> A: No.
> Q: Did they pressure you, strong arm you?  I'm not being wise, just did they put any pressure on you about doing that?
> A: No.
> Q: They explained it to you clearly?
> A: Um-hum.
> Q: And did they ask you to sign something after they explained it to you?
> A: Yes, they did.
> Q: And did you put your signature on something?
> A: Yes, I did.

Government Ex. 14 at 12-13.

atmosphere at 16 Harrow Street that morning was undoubtedly chaotic, the evidence shows that Smith's demeanor throughout the incident was cordial and cooperative; there was no evidence that she appeared intimidated or distressed. Compare United States v. Andrade, 925 F. Supp. 71, 82 (D. Mass. 1996) (consenting party seemed "clear-headed" and "sufficiently composed") with Lucas, 2009 WL 1844288, at *23 (consenting party was "in significant emotional distress at the time . . . she was crying, shaking, and breathing heavily"). There is also no evidence that Smith or any other occupants in the home were mistreated or restrained, or that the police acted in an overbearing or unduly coercive manner. Smith was fully informed about the officers' desire to search, and she signed the consent form without voicing any reservations.

I credit Wohlgemuth's testimony that he did not threaten Smith with respect to her housing or the custody of her granddaughter. While the officers did say that everyone would have to wait outside if a search warrant were necessary, they are entitled to secure an area provided "there is probable cause to believe that evidence is located in a house and that the occupants will remove or destroy it pending the issuance of a warrant." United States v. DiGregorio, 605 F.2d 1184, 1188 (1st Cir. 1979). Stating an intent to secure a search warrant, where the facts were sufficient to support its issuance, does not itself constitute coercion. United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003); United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989). Here, the Task Force had just arrested the suspect in an armed bank robbery in the apartment of his girlfriend's family where he was a frequent overnight guest. There was "a fair probability that contraband or evidence of a crime" would be found in the

residence, sufficient to support a search warrant, Illinois v. Gates, 462 U.S. 213, 238 (1983), and a reasonable concern that the occupants of 16 Harrow Street may be motivated to dispose of such evidence to aid and protect defendant.

Finally, I am persuaded that the driving force for Smith's consent was not fear from alleged threats to her housing and family, but rather a firm sense that she had "nothing to hide."  In her hearing testimony, Smith stated repeatedly that she consented to the search primarily because she knew her son Tommy was not in the apartment. See 4/3/13 Tr. at 88-89 ("I didn't mind them searching because, like I said, I had nothing to hide.  They were looking for Tommy at the time.  So, while they were looking for Tommy, I had no reason not to cooperate."); id. at 89 ("And I signed the consent form because I wasn't worried about them finding Tommy at my house."); id. at 96 (Q: "And you just testified that you had no problem [with consenting to a search] because you had no reason to hide anything and you wanted to cooperate?"  A: "Correct. . . Because Tommy wasn't there and they told me they was looking for Tommy."); id. at 99-100 ("I didn't mind them searching my house because they said they was looking for Tommy.").  Smith's misunderstanding of the purpose of the search is puzzling given that Wohlgemuth explained to her that the officers would be searching for evidence of a bank robbery, not to mention that defendant had just been arrested in her home and Smith had been asked to look at surveillance photos from the robbery. Nonetheless, absent evidence that the police somehow misled Smith or misrepresented their request to search, Smith's apparent confusion does not make her consent the product of coercion.

19

The evidence found and seized at 16 Harrow Street will not be suppressed.

**B.  Motion to Suppress Photo Identification by Orsini**

Defendant seeks to suppress the photo identification made by Barbara Orsini, a teller at the Citizens Bank, as the product of an unfairly suggestive process.  "[T]he Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"  Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012).  A court must consider, first, whether a pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Manson v. Brathwaite, 432 U.S. 98, 105 n.8 (1977).  If the court finds that the identification was procured under unnecessarily suggestive circumstances arranged by law enforcement, then it must determine "whether the identification itself was reliable under the totality of the circumstances."  United States v. Henderson, 320 F.3d 91, 100 (1st Cir. 2003).  See also Perry, 132 S. Ct at 720, 729.  Among the factors to be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  Id. at 725 n.5 (quoting Brathwaite, 432 U.S. at 114).

Defendant argues that the identification procedure used with Orsini was unnecessarily suggestive because the photo array was presented by Detective DiSalvatore, who knew which photograph depicted defendant (a "traditional

presenter").[10]  In contrast, when Victoria Lawyer, the "victim teller" of the robbery, was

shown the same array three days earlier by an officer unaware of the identity of the

suspect (a "blind presenter"), she was unable to make an identification.  Defendant

cites no case law supporting the idea that identification procedures by traditional

presenters are per se suggestive.  Rather, he claims that the officers should have used

a blind presenter with Orsini to prevent "overt manipulation by police as well as the

unconscious suggestion that occurs when the witness 'perceive[s] cues that the police

never intended to convey.'"  Docket # 70 at 26 (quoting Brandon L. Garrett,

Eyewitnesses and Exclusion, 65 Vand. L. Rev. 451, 469-70 (2012)).

Defendant's argument is entirely speculative and, in the circumstances of this

case, without merit.  There is no evidence that DiSalvatore or other officers attempted

to influence Orsini's identification in any way, or that DiSalvatore's status as a

traditional presenter tainted the identification procedure.  Orsini testified that she did

not have any contact or communication with law enforcement between the day of the

robbery and the day of the photo array.  She also did not view any bank surveillance

photographs from the robbery or discuss the perpetrator with her colleagues during that

time period.  The identification procedure itself was straightforward: DiSalvatore met

with Orsini at the bank, stated that he had some photographs for her to view, and

showed her a series of eight pictures, one at a time sequentially.[11]  After looking

---

[10] Defendant does not challenge the photographs used in the array.

[11] DiSalvatore also testified that prior to showing Orsini the array, he went through a standard checklist of advisements that are given to witnesses before presentation.  Orsini could recall that DiSalvatore made some statements to that effect.

through the array twice, Orsini told the detective that she had two of the photographs in her mind. DiSalvatore said nothing in response. Orsini then set aside the two photographs and eventually selected defendant's picture saying, "This is the guy." 4/3/13 Tr. at 62. DiSalvatore did not inquire as to Orsini's degree of certainty about the identification, and Orsini testified that his only response was to ask her to sign the back of the photograph. On these facts, I find that the procedure used did not create a "substantial likelihood of misidentification." See Simmons v. United States, 390 U.S. 377, 385 (photo array procedure, while not ideal, was not impermissibly suggestive where there was "no evidence to indicate that the witnesses were told anything about the progress the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.").

Given that the photo array was not impermissibly suggestive, I need not consider the question of reliability. Perry, 132 S. Ct. 729. Nonetheless, I find that Orsini's identification was constitutionally reliable. She was not waiting on any customers when the robbery occurred and had sufficient opportunity to view the robber from her teller station, which was approximately ten feet from the bank's entrance. He walked past her while entering the bank, and she observed him go to a customer service desk and then up to Lawyer's teller station. He went past Orsini again on his way out of the bank. By then, Orsini had learned from Lawyer that the bank had been robbed and immediately turned her attention to the glass vestibule, where the robber was locked in the man-trap. She observed him yelling and swearing while looking into the bank, enabling her to see his face. The description of the suspect that Orsini gave to the

police later that day accurately matched the images captured on surveillance.

Defendant also seeks to preclude Orsini from making an in-court identification, claiming that subsequent events have tainted her ability to make her identification based only on her perceptions from the robbery.  Specifically, defendant argues that, having already identified defendant as the robber in a photo array, she is likely to persist in that identification based on a memory "of the photograph rather than of the person actually seen."  Simmons, 390 U.S. at 383-84.  Defendant also asserts that Orsini has been prejudiced by improper communication with DiSalvatore prior to the motion hearing wherein he told her that her testimony was necessary and that the police would protect her if anyone came after her.[12]  However, the extent to which these issues may cast doubt on Orsini's ability to fairly and reliably make an identification can be tested at trial on cross-examination.[13]  See United States v. De Leon-Quinones, 588 F.3d 748, 753 (1st Cir. 2009) ("Identification evidence is for the jury in all but 'extraordinary cases.'") (citation omitted).  The request to preclude Orsini from making an identification at trial is denied.

## III. Conclusion

Defendant's motion to suppress the evidence seized at 16 Harrow Street (Docket # 54) is DENIED.  Defendant's motion to suppress the photo identification by

---

[12]  DiSalvatore testified that he may have told Orsini prior to the hearing that defendant was in a gang.  Orsini, however, testified that she had heard of defendant's potential gang affiliation through the "scuttlebutt" from her coworkers, allegedly stemming from a Malden police officer who was a customer of the bank.

[13]  Notably, when presented with the same photo array at the motion hearing, Orsini was not able to make an identification – a fact that would seem to belie defendant's claims that Orsini's prior identification and her conversation with DiSalvatore had highly prejudicial effects.

Barbara Orsini (Docket # 57) is DENIED.


_____September 4, 2013_____                    _____/s/Rya W. Zobel_____
            DATE                                          RYA W. ZOBEL
                                            UNITED STATES DISTRICT JUDGE